1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TOUT SAECHAO,

11            Petitioner,                    No. CIV S-03-01433 ALA HC

12        vs.

13   D.L. RUNNELS, Warden,                   ORDER

14            Respondent.

15   _____/

16        Tout Saechao, a state prisoner, filed a pro se application for habeas corpus relief pursuant

17   to 28 U.S.C. § 2254(a) on July 7, 2003.  He alleges several violations of his federal constitutional

18   rights.  After reviewing the record of his state trial and considering each of his claims this Court

19   concludes that each contention lacks merit.

20                                     **I**

21                                     **A**

22        The California Court of Appeal for the Third Appellate District summarized the facts in

23   its opinion in which it affirmed the state trial court's judgment as follows:

24        Meuy Saelee (also known as "Tiffany") lived with defendant, Lo Saechao (also
         known as "Chris"), Ted Crenshaw, Kou Vang (also known as "Buger"), and Joe
25       Scott in Joe's house on Canyon Woods Court in Sacramento. [   ] Pao Thao (also
         known as "Danny") and someone known as "Tommy" frequently visited Joe's
26       house.

                                        1

Defendant and Danny were considered the leaders of the others. Defendant was the leader of Ted and Chris, and Danny was the leader of Buger and Tommy. If Danny gave an order to Ted or Chris, they were supposed to follow it as if it had been given by defendant. Likewise if defendant gave an order to Buger or Tommy they would follow it as if had been given by Danny. Defendant and Danny considered themselves equals.

Defendant was in the business of selling methamphetamine. Chris and Ted worked for defendant, selling drugs and collecting money.

Tiffany, who was 19 or 20 at the time of her murder, had a learning disability. As a result, she received social security benefits. She and defendant were related. Tiffany and defendant lived together in a motel before they moved in with Joe Scott. Once when they were living at the motel, Tiffany told defendant she wanted to leave. He responded, "Bitch, if you fucking snitch, I'll fucking kill you." After they moved into Joe Scott's house, Tiffany cleaned and cooked for the group.

On the afternoon of June 14, 1998, Joe Scott fumigated his house for fleas. Everyone was ready to leave the house, except for Tiffany, who did not want to leave. Barbara Chang, defendant's girlfriend, finally persuaded Tiffany to get into Barbara's van, and Barbara drove defendant, Tiffany, Chris, and Ted to Henry Jones's house.

Once they arrived at Henry's house, Tiffany immediately tried to walk away, but she was prevented from doing so by Chris and Ted. Defendant told Chris and Ted to keep Tiffany in the van.

The evidence concerning the actions of Tiffany and the others at Henry Jones's house came in through the testimony of Barbara Change, Chris, and Tonette McBride. Their accounts were conflicting.

Barbara Chang testified that after Chris and Ted prevented Tiffany's escape, Henry talked to Tiffany, and the two of them went to the porch and sat down and talked. Barbara testified that she and defendant stayed in the van and fought the entire time. During this time Chris and Ted went up to Henry's house. Barbara was unsure whether Tiffany ever went inside. At some point Danny, Tommy, and Buger arrived. Danny, Tommy, Buger, and Tiffany left in Danny's car. Barbara testified Tiffany appeared to go willingly. Barbara and defendant left in Barbara's van.

Chris testified after he and Ted prevented Tiffany from leaving, she went back into the van. He and Chris went upstairs to look for Henry Jones. As they left he could hear loud voices, including Tiffany's voice and defendant's voice, in the van. Henry never came out of the house. When Chris came back outside after being in Henry's house for some period, Tiffany, Barbara, and defendant were all still in the van. They were no longer fighting. Danny, Buger, and Tommy had arrived. Danny told everyone to go back to the house, so they all left. Chris, Ted and Buger left in Danny's car. Defendant and Barbara left in Barbara's van. Tiffany, Danny and Tommy left in Tommy's car. Tiffany did not appear to have

2

any objection to going with Danny and Tommy in Tommy's car. Before they left Henry's, defendant instructed Chris not to let Tiffany leave Joe Scott's house.

Tonette McBride lived downstairs from Henry Jones. She testified the last time she saw Tiffany was in June 1998. Tonette testified she was looking out of the window in her apartment, when she saw Tiffany and the defendant arrive in a van. Defendant was driving the van. She then saw defendant and Tiffany go upstairs. About 15 or 20 minutes later, she could hear Tiffany yelling. This went on for about five or ten minutes. A little later, she could hear Tiffany yelling. This went on for about five or ten minutes. A little later she saw defendant and Tiffany in the van again. Tiffany was screaming and crying. Defendant was shaking her by the shoulders. Tonette left briefly to try to get her boyfriend to come and see what was happening. When she returned to the window, she could see Tiffany trying to get out of the van. Defendant was hitting Tiffany to try to hush her up. Tiffany kept screaming for about 10 minutes.

Tonette did not see Danny arrive, but she did see him there. Danny was inside the van. He was shaking Tiffany. Danny hit Tiffany "a couple of times." Tonette did not see the van pull away. Tonette never saw anyone outside other than defendant, Danny, and Tiffany.

Everyone left Henry's, and eventually went back to the house on Canyon woods. Sometime during the evening, defendant, Danny, and Buger left. Tiffany tried to leave the house during the night, but Chris and Ted stopped her. Chris slapped Tiffany and kicked her. Tiffany got a butcher knife from the kitchen, and Chris grabbed a gun. Ted took the knife away from Tiffany. Things quieted down, and Tiffany eventually fell asleep.

Later that night, defendant called and instructed Joe Scott to take Barbara Chang to a friend's house. Shortly after Joe and Barbara left, defendant called the house again and ordered Chris and Ted to tie up Tiffany, take her to defendant's bedroom and wait for defendant to return. Defendant also instructed Chris not to let Joe see what was going on. They proceeded to tie Tiffany up and put her on a couch in defendant's bedroom.

Around eight or nine in the morning, Joe Scott came back to his house after delivering Barbara to her friend's house. He decided to borrow a videotape from defendant's room. When he went in, he saw Tiffany tied up on the couch. She was still alive. Chris panicked and told Joe he was supposed to have seen Tiffany. Shortly thereafter, defendant, Danny, and Buger came back. Defendant pulled Chris aside and told him to go purchase a box and some tape. Defendant and Danny went into Joe's bedroom. They told him Tiffany had threatened to call the police on defendant and "take him down." They said they could not allow her to take a brother down.

Chris returned with a wardrobe box. Ted came out of defendant's bedroom, and got a stethoscope from the closet. Chris took the stethoscope to defendant's bedroom. He checked Tiffany for a heartbeat, but he did not know how to use the stethoscope. she did not appear to be awake. Her hands were untied and her face was uncovered.

3

Defendant told Chris to put the box together and back the van up next to the house.  Buger and Ted brought the box out of the bedroom, and Chris helped them load it into the van.  Defendant and Danny instructed Buger to get some weights out of the house, and told Chris to drive the van and follow them.

They drove down by a river near a creek.  They stopped at a pier and took out the box and the weights.  Chris, Ted, and Buger opened the box.  Tiffany's body was inside.  A cloth was taped over her face.  Her hands and ankles were tied.  Chris, Ted and Buger tied the weights to Tiffany's body.  They threw her body in the river.

On June 25, 1998, a jogger in the area of Babel Slough spotted Tiffany's body floating in the water.  Authorities went to the newspaper, radio, and television in order to identify Tiffany's body.

**B**

Petitioner was convicted by a jury in the Yolo County Superior Court of the crime of murder in the first degree and kidnapping under California law.[1]  The jury also found that the prosecution met its burden of proving the special circumstances of committing a first degree murder, during the commission of the crime of kidnapping.

The trial court sentenced Petitioner to serve a term of life imprisonment without the possibility of parole.  He also received a sentence of sixteen years based on the kidnapping charge.  These sentences were ordered to run consecutively.

**C**

Petitioner filed a direct appeal from the judgment in the California Court of Appeal on October 25, 2000.  That Court affirmed the trial court's judgment, but stayed the prison term for kidnapping.  Petitioner filed a petition for review of the California Court of Appeal's opinion in the Supreme Court of California.  The petition for review was denied by the California Supreme Court on February 14, 2001.  Petitioner did not file a petition for certiorari in the United States Supreme Court.

**II**

---

[1]  Petitioner was also charged with the crime of attempting to dissuade a witness in violation of section 136.1(a)(2) of the California Penal Code.  The jury found him not guilty of this offense.

4

**A**

Petitioner filed a petition for writ of habeas corpus relief in the Yolo County Superior Court.  It was denied on December 14, 2001.

**B**

Subsequently, Petitioner filed a petition for a writ of habeas corpus relief in the California Court of Appeal for the Third Appellate District.  It was denied on February 21, 2002.

**C**

Petitioner filed a petition for a writ of habeas corpus relief in the California Supreme Court in which he raised the same federal constitutional claims he later presented in this Court.  That petition was denied on June 11, 2003.

**III**

Petitioner filed the pending application for a writ of habeas corpus, pursuant to § 2254(a) in this Court on July 7, 2003.  He maintains that his application must be granted based on federal constitutional errors that compel the setting aside of his conviction.  In analyzing these contentions, this Court must comply with the restrictions Congress has placed on the authority of federal courts in reviewing applications for habeas corpus relief filed pursuant to § 2254(a).

Federal habeas corpus relief is not available to state prisoners for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court in the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The California courts rejected the federal constitutional claims alleged by Petitioner in his state habeas corpus petitions without comment.  Accordingly, this court must independently review the record and relevant federal law to determine whether the trial court's judgment was

1  "contrary to, or involved an unreasonable application of, clearly established federal law, as

2  determined by the Supreme Court of the United States." *Delgado v. Lewis*, 223 F.3d 976, 981-

3  82 (9th Cir. 2000).

4                                                    **A**

5          In his first and second claims, Petitioner argues that the trial court violated his Fifth and

6  Fourteenth Amendment rights to due process by instructing the jury, and permitting the

7  prosecutor to argue, that a person can be found guilty of murder and kidnapping, as alleged in

8  the accusatory pleading, if the evidence shows that he or she conspired with others to commit

9  those offenses, even though the defendant was not also charged with the crime of conspiring to

10  murder and kidnap another person.

11          Petitioner contends that, by instructing the jury regarding the liability of co-conspirator,

12  the state trial court constructively amended the information by permitting the jury to convict him

13  of a crime not charged in the accusatory pleading, i.e., conspiracy to commit first degree murder

14  and kidnapping.  Petitioner argues that "[t]he court's instructions directed the jury to find

15  Petitioner guilty of murder and kidnapping as a principal if it found Petitioner guilty of being a

16  member of a conspiracy to commit these crimes."  Petitioner's traverse at page 5.

17          In *Stirone v. United States*, 361 U.S. 212, 217 (1960), the Supreme Court instructed that

18  "a court cannot permit a defendant to be tried on charges that are not made in the indictment

19  against him."  *Id*. at 217.   In *Stirone*, the defendant was charged in the indictment with

20  interfering with interstate commerce on violation of the Hobbs Act, 18 U.S.C. § 1951, by

21  importing sand into Pennsylvania used to build a steel plant.  The trial court permitted the

22  prosecution to introduce evidence to show that the defendant interfered with interstate commerce

23  by exporting steel from Pennsylvania manufactured in the new plant.  The trial court instructed

24  the jury that it could convict the defendant of interfering with interstate commerce in violation of

25  the Hobbs Act if it found that he imported sand or exported steel.  *Id*. at 213-14.  The Supreme

26  Court reversed the conviction.  It held that "[t]he very purpose of the requirement that a man be

1    indicted by the grand jury is to limit his jeopardy to offenses charged by a group of his fellow

2    citizens independently of either prosecuting attorney or judge." *Id.* at 218.  Thus, in *Stirone*, the

3    jury was instructed that it could convict the accused of a discrete crime not charged in the

4    accusatory pleading.

5            In this matter, the trial court instructed the jury regarding the elements of the uncharged

6    offense of conspiracy so that it could determine if he was guilty of murder and kidnapping as a

7    co-conspirator.  However, the verdict form submitted to the jury did not instruct the jury that it

8    could find Petitioner guilty of the crime of conspiracy to commit the crime of murder in the first

9    degree and kidnapping.

10           Petitioner has failed to demonstrate that the trial court's instruction on one liability of a

11   co-conspirator was contrary to any decision of the United States Supreme Court.  Rather,

12   Petitioner has confused the requirement that the prosecutor prove the elements of an offense

13   alleged in an accusatory pleading with the discrete burden of demonstrating that the defendant is

14   connected to the crime charged in the accusatory pleading as (1) the person who inflicted the

15   injury to the victim, or (2) aided and abetted the commission of the alleged crime, or (3) who

16   acted as a co-conspirator.

17           Under California law, a co-conspirator can be found guilty of a substantive crime,

18   notwithstanding the fact that the accused was not also charged with the crime of conspiracy.

19           It is long and firmly established that an uncharged conspiracy may
          properly be used to prove criminal liability for acts of a

20        coconspirator.  (*People v. Lopez* (1963) 60 Cal.2d 223, 250 [32
          Cal. Rptr. 424, 384 P.2d 16] [uncharged conspiracy to commit

21        burglaries admissible to prove identity of murderer]; *People v.
          Pike* (1962) 58 Cal.2d 70, 88 [22 Cal. Rptr. 664, 372 P.2d 656]

22        [uncharged conspiracy to commit robberies admissible to prove
          armed robbery culminating in murder].)  "Failure to charge

23        conspiracy as a separate offense does not preclude the People from
          proving that those substantive offenses which are charged were

24        committed in furtherance of a criminal conspiracy [citation]; nor, it
          follows, does it preclude the giving of jury instructions based on a

25        conspiracy theory (*People v. Washington* (1969) 71 Cal.2d 1170,
          1174 [81 Cal. Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]; *People v.*

26        *Ditson* (1962) 57 Cal.2d 415, 447 [20 Cal. Rptr. 165, 369 P.2d

714])." (*People v. Remiro* (1979) 89 Cal. App. 3d 809, 842 [153 Cal. Rptr. 89, 2 A.L.R. 4th 1135].)

*People v. Belmontes*, 45 Cal. 3d 744, 788-89 (1988).

The trial court instructed the jury it could consider evidence that established beyond a reasonable doubt that Petitioner was a co-conspirator in the commission of the substantive crimes charged in the accusatory pleading to rebut evidence introduced by the defense that he was not present at the time and place where the victim was kidnapped and murdered.

Pursuant to CALJIC 4.50,the jury was instructed as follows:

> The defendant in this case has introduced evidence for the purpose of showing that he was not present at the time and place of the commission of the alleged crime for which he is here on trial.  If after consideration of all the evidence, you have a reasonable doubt that the defendant was present at the time the crime was committed you must find him not guilty.

CALJIC 4.51 was also read to the jury.  It provides:

> However, if the evidence establishes beyond a reasonable doubt that the defendant aided and abetted the commission of or was a co-conspirator in the communion of the crime charged in this case, the fact if it is a fact that the was not present at the time and place of the commission of the alleged crime for which he is being tried does not matter and does not, in and of itself entitle the defendant to an acquittal.

The trial court instructed the jury pursuant to CALJIC 3.00 that

> [p]ersons who are involved in committing a crime are referred to as principals in that crime.  Each principal, regardless of the extent or manner of the extent or manner of participation is equally guilty.  Principals include:
>
> 1.  Those who directly and actively commit the act constituting the crime or
>
> 2.  Those who aid and abet the commission of the crime.

The trial court also defined the term "accomplice" as follows: "An accomplice is a person who is subject to prosecution for the identical offense charged against the defendant on trial by reason of aiding and abetting or being a member of a criminal conspiracy" pursuant to CALJIC 3.10.

We recite this aspect of California law to explain Petitioner's confusion.  However, we cannot assess whether the state law was correctly applied.  *See Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (stating "we have no authority to review a state's application of its own laws").  "Our duty [as a federal court] is to determine whether the prisoner's constitutional or other federal rights have been violated."  *Id.*  Accordingly, this Court concludes that the trial court did not violate Petitioner's constitutional or federal rights because the information was not constructively amended as a result of the trial court's instruction that a defendant can be connected to the crimes alleged in the accusatory pleading if he or she acted as a co-conspirator.

**B**

In his third claim for habeas corpus relief, Petitioner contends that the state trial court's instruction regarding uncharged offenses, based on CALJIC 2.50.1, permitted the jury to find him guilty of the charges in the accusatory pleading by a preponderance of the evidence.  The trial court instructed the jury regarding the prosecution's burden of proof as follows:  "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt."

In reading CALJIC 4.51 regarding the liability of a co-conspirator, the trial court again admonishes the jury that the evidence must establish "beyond a reasonable doubt" that the defendant "was a co-conspirator of the crime charged in this case."

The trial court also instructed the jury that evidence had been presented that "the defendant committed crimes other than that for which he is on trial."  The jury read CALJIC 2.50 to the jury.  It reads as follows:

> Evidence has been introduced for the purpose of showing that the
> defendant committed crimes other than that for which he is on
> trial.

1   Except as you will be otherwise instructed, this evidence, if

2   believed, may not be considered by you to prove that defendant is

3   a person of bad character or that he has a disposition to commit

4   crimes.  It may be considered by you only for the limited purpose

5   of determining if it tends to show:

6   A motive for the commission of the crime charged;

7   or the existence of a conspiracy.

8   For the limited purpose for which you may consider such evidence

9   you must weigh it in the same manner as you do all other evidence

10   in the case.

11   You are not permitted to consider such evidence for any other

12   purpose.

13 CALJIC 2.50.

14   Unfortunately, the trial court also read CALJIC 2.50.1 to the jury.  It reads as follows:

15   Within the meaning of the preceding instruction, the prosecution

16   has the burden of providing by a preponderance of the evidence

17   that a defendant committed crimes other than those for which he is

18   on trial.

19   You must not consider this evidence for any purpose unless you

20   find by a preponderance of the evidence that a defendant

21   committed the other crimes.

22   The trial court erred in failing to limit CALJIC 2.50.1 to the evidence of uncharged

23 crimes that was admitted to show that the defendant had a *motive* for the commission of the

24 crime charged in the information.  Evidence was presented by the prosecutor that Petitioner's

25 motive to kill the victim was based on her threat to inform the police that he was a drug dealer.

26 The trial court's instruction based on CALJIC 2.50.1 was inconsistent with the trial court's

1  correct instruction based on CALJIC 4.51, that the prosecution must prove a co-conspirator's

2  connection to the substantive crimes charged in an accusatory pleading beyond a reasonable

3  doubt.

4         Pursuant to § 2254(d), this Court must determine whether the state trial court's

5  ambiguous and inconsistent instructions were contrary to clearly established federal law, as

6  determined by the United States Supreme Court.  In *Estelle v. McGuire*, 502 U.S. 62 (1991), the

7  Supreme Court held that the test to be applied in determining whether an erroneous instruction

8  violates the Due Process Clause depends upon whether the instruction by itself infected the

9  entire trial and Petitioner's right to a fair trial.  *Id.* at 72.

10         In determining whether a single misleading instruction violates due process, the proper

11  inquiry is "not whether the instruction 'could have' been applied unconstitutionally, but whether

12  there is a reasonable likelihood that the jury *did* so apply it."  *Tyler v. Cain*, 533 U.S. 656, 659

13  n.1 (2001).  In making this determination, a federal court must view the questionable instruction

14  in the context of the instructions as a whole.[2]  This court is persuaded that when viewed as a

15  whole, there is no reasonable likelihood that the jury failed to apply the trial court's instructions

16  that Petitioner could not be found guilty unless it was persuaded beyond a reasonable doubt that

17

---

18      [2] The prosecutor did not exploit the fact that the Court gave inconsistent instructions

19  relating to the standard of proof required where evidence is presented of an uncharged conspiracy to connect a defendant to the substantive offenses charged in the accusatory pleading. In her final summation of the evidence that corroborated the testimony of Petitioner's

20  accomplice, the prosecutor stated to the jury:

21            All of that ladies and gentlemen, all of that in and of itself is proof beyond a reasonable doubt that the defendant was responsible for

22            the homicide of Meury Saelee.  And we know it from the statement in Joe's room, specifically, and we know it from all the other

23            surrounding evidence.

24  Reporter's Transcript at page 1748.

25  At no time in her closing arguments to the jury did the prosecutor argue that the jury could find Petitioner guilty if it was persuaded by a preponderance of the evidence that he was a co-

26  conspirator in causing the kidnapping and death of the victim.

1    he was a co-conspirator.

2    <center>**C**</center>

3      Petitioner maintains in his fourth claim that the admission of Robert Joseph Scott's

4    hearsay testimony violated the Confrontation Clause of the Sixth Amendment.  This argument is

5    premised on Petitioner's claim that the evidence was insufficient to demonstrate beyond a

6    reasonable doubt that he was a co-conspirator in the kidnapping and murder of Meury Salee.

7    This contention was raised for the first time in Petitioner's state petition for a writ of habeas

8    corpus.  The California Supreme Court denied habeas corpus relief without comment.  Because

9    there is no underlying reasoned state court decision, this Court must independently review

10   whether the state court's resolution of Petitioner's Confrontational Clause claim was "contrary

11   to, or invoked an unreasonable application of, clearly established federal law as determined by

12   the Supreme Court of the United States." *Delgado*, 181 F. 3d at 1091.

13     Scott's testimony related statements made by his co-conspirators.  In one statement, Pao

14   Thao repeated a statement made by Meuy Saelee.  Respondent contends that Saelee's statement

15   to Pao Thao was not hearsay because it was introduced for purposes of showing the effect the

16   statements had, and not that the statements were actually true.  Nonhearsay does not raise

17   Confrontation Clause concerns.  *Tennessee v. Street*, 471 U.S. 409, 414 (1985).  The

18   fundamental role of the Clause is "protecting the right of cross-examination."  *Id.*.  That right is

19   protected when the declarant who repeats an out-of-court statement is cross-examined.  *Id.*  Here,

20   the declarant was available for cross-examination.

21     As to the remaining co-conspirator statements, Respondent argues that they were made in

22   furtherance of a conspiracy because they were "aimed at coercing Scott to keep quite [sic] and

23   uninvolved while Thao, Petitioner, and their minions were still in the process of carrying out

24   their sadistic endeavors."  *Answer* at 22.  Respondent explains that these statements were

25   admitted pursuant to California Evidence Code Section 1223.  Such statements do not raise

26   Confrontation Clause concerns because "they are made while the conspiracy is in progress," and

<center>12</center>

1  therefore "provide evidence of the conspiracy's context that cannot be replicated, even if the

2  declarant testifies to the same matters in court." *United States v. Inadi*, 475 U.S. 387, 395

3  (1986).

4                                                      **D**

5          In his fifth claim, Petitioner maintains that his conviction was not supported by sufficient

6  evidence, and therefore, also violated the Due Process Clause.  Petr.'s Mem P. & A at 9.

7  Petitioner presents this Court with a hybrid argument that there is no evidence that Saelle was

8  ever moved without her consent, or that he was involved in the kidnapping.  Petr.'s Mem. P & A.

9  at 9.

10         The Due Process Clause of the Fourteenth Amendment "protects the accused against

11  conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

12  crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient

13  evidence to support a conviction if, "after viewing the evidence in the light most favorable to the

14  prosecution, any rational trier of fact could have found the essential elements of the crime

15  beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive

16  question under *Jackson* is 'whether the record evidence could reasonably support a finding of

17  guilt beyond a reasonable doubt."  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting

18  Jackson, 443 U.S. at 318).  A petitioner in a federal habeas corpus proceeding "faces a heavy

19  burden when challenging the sufficiency of the evidence used to obtain a state conviction on

20  federal due process grounds."  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  In a state

21  prisoner's application for a writ of habeas corpus, a federal court must find that the decision of

22  the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the

23  fact of the case.  *Id.* at 1275.

24         When the sufficiency of the evidence is challenged by a state prisoner in federal habeas

25  corpus proceedings, a federal court must review the entire record.  *Adamson v. Ricketts*, 758 F.2d

26  441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc),

rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, a reviewing court will assign the inference that favors conviction.  *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994).  "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991)).  A federal court must determine the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 234 n.16.

Under California law, a simple kidnapping occurs when a person: (1) forcibly, or by any other means of instilling fear; (2) steals or takes, or holds, detains, or arrests any person; and (3) and carries the person into another country, state, or county, or into another part of the same county.  Cal. Penal Code § 207(a).  Kidnapping can only be accomplished by the use or threat of force; fraud is not enough.  *People v. Davis*, 896 P.2d 119, 148 n.13 (Cal. 1995) (quoting *People v. Green*, 609 P.2d 468, 507 (Cal. 1980)).  There is no dispute that Saelee was moved from the duplex to Jones' house and back.  RT at 723, 745.  This leaves the question of whether Saelee was forced to move against her will.

The element of forcible asportation required for a kidnapping conviction is not met where the person in question consents to go with the defendant, even if consent is obtained by fraud. *Davis*, 896 P.2d at 147.  However, kidnapping may still occur if a victim initially voluntarily goes somewhere with a defendant, or voluntarily permitted the defendant to go somewhere with her, but thereafter the victim is transported after being forcibly restrained from leaving.  *Id.* at 147-48 (holding that there was sufficient evidence to support the prosecution's theory that a consensual asportation became a kidnapping when the defendant applied force to the victim and thereby transformed the event into a kidnapping from that point on).

14

1    The testimony at trial was sufficient to support an inference that Saelee agreed to go to

2  Henry Jones's house with Petitioner and his friends.  The prosecutor presented testimony that

3  Saelee may have consented to going back to the duplex with Petitioner and his friends.  Answer,

4  Appendix F at 10.  Although Saelee may have at some point consented to accompanying

5  Petitioner, her consensual movement was later transformed into a kidnapping by force.  The

6  record shows that Saelee tried to leave the group or "escape" on numerous occasions.  However,

7  on each occasion, Saelee was prevented from doing so by physical force and violence.

8    In addition to the physical force that transformed Saelee's movements into a kidnapping,

9  there was evidence that implicated Petitioner in Saelee's kidnapping as a co-conspirator.  This

10  evidence is sufficient for a reasonably jury to find beyond a reasonable doubt that Saelee was

11  forcibly moved and that Petitioner was involved.  This conclusion is supported by Saelee's

12  demeanor during the events on the day of her death.  Saelee was repeatedly crying and upset that

13  she was not being allowed to leave.  *Id.* at 731, 1155.  This evidence provides a sufficient basis

14  for a reasonable jury to find that Saelee was forcibly moved against her will and, therefore,

15  kidnapped.  Petitioner's conviction for kidnapping and first degree murder was supported by the

16  evidence.

17    **E**

18    In his sixth claim, Petitioner asserts that his trial counsel's representation was ineffective

19  in violation of the  Sixth Amendment because he failed to object during trial to the constructive

20  amendment of the accusatory pleading, the improper application of the preponderance of the

21  evidence standard of proof in a criminal proceeding, and the failure to object to the admission of

22  hearsay evidence in violation of the Confrontation Clause.  As discussed above, this Court has

23  determined that reversible error did not occur regarding each of these contentions.  Therefore,

24  Petitioner has failed to demonstrate that his trial counsel's performance was prejudicial.

25    **F**

26    Petitioner also maintains that his counsel was ineffective for failure to present his claim

15

that his trial counsel was ineffective.  This Court has determined that Petitioner has failed to demonstrate that his trial counsel's representative was ineffective.  Accordingly, Petitioner's contention that his appellate counsel was ineffective also must be rejected.

### G

Finally, Petitioner argues that his trial counsel was ineffective for failing to conduct a reasonable investigation to determine whether Jones would have contradicted Tonette McBride's testimony at trial.

When evaluating an ineffective assistance of counsel argument concerning failure to investigate, locate, and produce additional witnesses at trial, a thorough understanding of the case as presented to the jury is necessary in order to determine whether the additional evidence would undermine confidence in the outcome.  *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999).

In an evidentiary hearing conducted during Petitioner's habeas proceedings before the California Superior Court, Jones was called as a witness by Petitioner's trial counsel.  He testified as follows:

> I was sitting in my front room, which is a big picture window, and I was watching television when I seen them pull in the driveway, because it's right in the front.  And the doors open and Saelee got out and run out across the lawn.  Lo Choi Saechao got out of the front, on the passenger side and caught up with her and he was kind of slapping her around and slapping her up in the head.  So I got up in between them, telling him he can't do that because I got neighbors that – you know, create a disturbance like that at my house.

The record also reflects the following colloquy:

> Q.  After you stopped Lo Choi Saechao from hitting on Saelee,

1  how was Saelee acting?

2  A.  She was crying.  She told me she didn't want to be there.

3  Q.  During the time that you stayed with Saelee did her demeanor

4  change in any way?  Did she stay upset and crying or did that

5  change?

6  A.  No.  She calmed down and we talked...She really calmed down.

7  I couldn't hardly understand her in the beginning, you know,

8  because she was pretty upset and crying.

9  Q.  When – did you see Saelee ever get in the car ready to leave?

10  A.  Yes.

11  Q.  Did anybody force her to get in the car to leave as it appeared

12  to you?

13  A.  No.

14  Q.  Did Saelee – by the time she got in the car to leave, you said

15  she was calmed down?

16  A.  Yeah, she calmed down and no crying....

17  Q.  Did you see anything that would suggest to you that Saelee was

18  leaving in that car against her will?

19  A.  No.

20  Q.  When you were talking to Saelee, did she express to you–

21  make any statements to you of fear or concerns for her own safety?

22  A.  No.

23  This testimony does not undermine Petitioner's conviction.  Jones's testimony shows that

24  Saelee tried to escape, and was physically prevented from doing so by Lo Choi Saechao.  This

25  testimony also supports the testimony of Barbara Chang, Lo Choi Saechao, and McBride that

26  Saelee was trying to leave, but was physically prevented from doing so.  Accordingly, Petitioner

17

1  was not prejudiced by counsel's failure to investigate, locate, and produce Jones for trial.

2  **CONCLUSION**

3    In accordance with the above, IT IS HEREBY ORDERED that Petitioner's application

4  for habeas corpus relief under § 2254 (doc. 1) is denied.

5  /////

6  DATED: March 20, 2008

7           /s/ Arthur L. Alarcón
         UNITED STATES CIRCUIT JUDGE
8           Sitting by Designation

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26